AB:RSB

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------- X

IN THE MATTER OF A SEARCH OF
ANY AND ALL COMPUTERS,
INCLUDING CELLULAR TELEPHONES,
ON FREDERICK ROGERS'S PERSON
OR FOR WHICH LAW ENFORCEMENT
HAS PROBABLE CAUSE TO BELIEVE
BELONG TO ROGERS AT THE TIME
OF HIS ARREST ON OR AFTER
NOVEMBER 8, 2023

**TO BE FILED UNDER SEAL**

**APPLICATION FOR A SEARCH WARRANT**

No.   23-MJ-00994

----------------------------------------------------- X

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Tatiana Biess, depose and say under penalty of perjury:

**Introduction**

1.      I make this affidavit in support of an application under Federal Rule of Criminal

Procedure 41 for a search warrant for the following SUBJECT DEVICES:

        a.   SUBJECT DEVICES: electronic devices, including cellular telephones, on the

        person of Frederick ROGERS, as well as any other electronic devices for

        which law enforcement has probable cause to believe belong to ROGERS

        given their location, including proximity to ROGERS at the time of the

        execution of this warrant and/or based upon information provided by

        ROGERS at the time of his arrest on or after November 8, 2023, as described

        in Attachment A.

2.      Based on the facts set forth in this affidavit, probable cause exists to believe that

violations of Title 18, United States Code, Sections 922(a)(6), 922(a)(5), 922(d)(1), and 371 (the

1

SUBJECT OFFENSES) have been committed and are being committed by Donell GLOVER and Frederick ROGERS, as well as others. Probable cause also exists to believe that the requested information from the SUBJECT DEVICES will constitute evidence of the above criminal offenses.  The information to be searched is described in the following paragraphs and in Attachment B.[1]

### Agent Background

3.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been for approximately six years. I am a member of ATF's Joint Firearms Task Force, and in that capacity, among other things, I am responsible for investigating firearms-related offenses. My training and experience has included investigating crimes facilitated by the use of electronic communication devices. I have received training regarding the use of cellular telephones and electronic devices in furtherance of criminal activity, and, through my work on the task force, I have experience in examining cellular telephones and electronic devices to search for evidence of crime. I also have experience reviewing call usage reports and data associated with cellular location data.

4.      During my tenure in law enforcement, I have personally conducted and/or assisted in investigations of criminal acts including, but not limited to: violations of Title 18, United States Code, Sections 922(a)(6), 922(a)(5), 922(d)(1), and 371.  As part of those investigations, I have conducted or personally participated in both physical and electronic surveillance, and I have been involved in the execution of various types of search and arrest warrants.

---

[1] This application seeks an anticipatory search warrant—i.e., "a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place," *United States v. Grubbs*, 547 U.S. 90, 94 (2006) (quoting 2 W. LaFave, Search and Seizure § 3.7(c), 398 (4th ed. 2004))—as approved by the U.S. Supreme Court. Further background regarding the legal basis for an anticipatory search warrant is provided below.

5.     Based upon my training and experience, I know that an Over-the-Counter Firearms Transaction Record (ATF Form 4473) is required to be completed, in part, by all persons prior to purchasing a firearm from a federally licensed firearms dealer ("FFL"), and the applicant is required to answer all questions truthfully. The form is designed so an FFL may determine if they may lawfully transfer a firearm to a prospective buyer. An FFL is then required to transmit a prospective buyer's identifying information to the Federal Bureau of Investigation's National Instant Background Check System ("NICS") Section. If the NICS search finds a record that requires more research to determine whether the prospective transferee is disqualified from possessing a firearm by federal or state law, NICS may subsequently instruct the FFL to delay the transfer. If the FFL receives no further instruction from NICS after three business days, the FFL may proceed with the firearm transfer.

6.     The statements contained in this Affidavit are based on my personal observations, my training and experience, as well as information obtained from other agents and witnesses. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning this investigation.

**The SUBJECT DEVICES**

7.     Based upon the investigation, and as further described below, I respectfully submit that there is probable cause to believe that ROGERS and others have committed the SUBJECT OFFENSES.  The property to be searched are the SUBJECT DEVICES. I am aware that ROGERS has used at least two cellular telephone numbers, further described below, in furtherance of these offenses. But based on my training and experience, I know that individuals involved in violations of firearms laws often change telephone numbers, in an effort to hide their activities from law enforcement, but keep the same physical electronic device. Those devices are

capable of storing electronic information regarding criminal activity even if the telephone number assigned has changed.  And, because electronic devices use cloud/off-site back-up storage, I know that these persons may change their telephone number and physical electronic device but re-load their applications with that same data on a different device.  Thus, there is probable cause to believe evidence regarding the SUBJECT OFFENSES would be stored/contained on electronic devices in ROGERS' possession, both those already identified by law enforcement and those not yet identified by law enforcement.  Finally, based on my training and experience, I know that individuals involved in violations of firearms laws often use multiple devices to coordinate their illegal activities so that they can keep information segregated in the event of law enforcement seize of one of the devices.  Because ROGERS has used at least two cellular telephone numbers to coordinate the transactions described below, I also respectfully submit that there is probable cause to believe that the SUBJECT DEVICES—including the telephones numbers already identified, but also other electronic devices not yet identified by law enforcement—will contain evidence, fruits, or instrumentalities of the SUBJECT OFFENSES.

8.     The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICES for the purpose of identifying electronically stored data, particularly described in Attachment B.

**Anticipatory Search Warrant**

9.     I have been advised that "[a]n anticipatory warrant is 'a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place.' Most anticipatory warrants subject their execution to some condition precedent other than the mere passage of time – a so-called 'triggering condition.'" *Grubbs*, 547 U.S. at 94 (quoting 2 W. LaFave, Search and Seizure § 3.7(c), 398). I

also have been advised that the U.S. Supreme Court and the Second Circuit each have upheld the

validity of anticipatory warrants. *Id.* at 96 ("[W]hen an anticipatory warrant is issued, 'the fact

that the contraband is not presently located at the place described in the warrant is immaterial, so

long as there is probable cause to believe that it will be there when the search warrant is

executed.'") (internal citation omitted); *United States v. Garcia*, 882 F.2d 699, 703 (2d Cir.

1989) ("We therefore explicitly hold today [that] . . . [a]nticipatory warrants are not

unconstitutional per se, and in the proper circumstances, may be an effective tool, both to fight

criminal activity, and to protect individual fourth amendment rights.").

10.     Additionally, I have been advised that an anticipatory warrant may be issued only

upon a finding of two conditions: "for a conditioned anticipatory warrant to comply with the

Fourth Amendment's requirement of probable cause, two prerequisites of probability must be

satisfied. It must be true not only that [1] if the triggering condition occurs 'there is a fair

probability that contraband or evidence of a crime will be found in a particular place,' . . . but

also that [2] there is probable cause to believe the triggering condition will occur. The supporting

affidavit must provide the magistrate with sufficient information to evaluate both aspects of the

probable-cause determination." *Grubbs*, 547 U.S. at 96-97 (emphasis omitted) (citing, *inter alia*,

*Garcia*, 882 F.2d at 703).

11.     For the reasons set forth above and below, there exists probable cause to believe

that the SUBJECT DEVICES will contain evidence, fruits, or instrumentalities of the SUBJECT

OFFENSES.

### Probable Cause

*Beginning of the investigation*

12.     The United States government, including the ATF, is investigating Donell

GLOVER and Frederick ROGERS for violations of firearms laws, including knowingly making false written statements to licensed dealers of firearms, sale and transfer of firearms to a non-resident, and sale or disposal of a firearm to a prohibited person, in violation of Title 18, United States Code, Sections 922(a)(6), 922(a)(5), 922(d)(1), and 371.

13.    ATF agents reviewed records concerning firearm transactions by GLOVER, including ATF Form 4473.  Between on or about December 2015 through July 2021, GLOVER purchased approximately 63 guns at about 12 different FFLs.  For each of these purchases, GLOVER completed an ATF Form 4473, which included a statement that GLOVER was purchasing a firearm(s) from an FFL and that GLOVER was the actual purchaser of the firearm(s).  Fifteen of those firearms were subsequently recovered by law enforcement, 12 of which were recovered in New York, 2 recovered in North Carolina, and one recovered in Georgia.  On each of these ATF Form 4473, GLOVER indicated that he was the actual purchaser of the firearm.

14.    Specifically, 5 of the 10 pistols GLOVER purchased on November 14, 2020, were recovered in New York on June 17, 2022; January 12, 2021; July 16, 2021; July 3, 2021; and June 10, 2021 by the New York City Police Department. According to the traces, one of the firearms was recovered from a convicted felon and another from a known gang member.

15.    Moreover, two of the eight pistols GLOVER purchased on November 28, 2020 were recovered in the Eastern District of New York (EDNY) in Brooklyn on December 28, 2020 (30 days later) and September 8, 2023 by the New York City Police Department.  One of the five pistols GLOVER purchased on November 29, 2020 was recovered by the Troy Police Department in New York.

16.    One of the firearms GLOVER purchased on May 5, 2021 was recovered by the

New York City Police Department. According to the trace, the firearm recovered on May 5, 2021 was recovered from an individual who was arrested about two months prior for criminal possession of a weapon.

*July 28, 2021 interview with GLOVER*

17.     On July 28, 2021, ATF investigators went to the address GLOVER listed on his FFL forms and conducted a consensual non-custodial interview of GLOVER.  Despite the ATF Form 4473 showing that GLOVER purchased approximately 63 guns since on or about December 2015 (on each of these ATF Form 4473, GLOVER verified that he was the actual purchaser of the firearm), GLOVER claimed to only have four guns in his possession and indicated he had sold the rest.  GLOVER also said that has a cousin, Frederick ROGERS, who is a resident of Queens, New York (EDNY) and is currently on parole.  GLOVER stated that ROGERS introduced GLOVER to two other individuals GLOVER knew as "Lil Q" and "Munch."  GLOVER said that in December of 2020, ROGERS, Lil Q, and Munch came to visit him in Georgia from New York (ROGERS and Lil Q from EDNY) and traveled on the Chinese bus (a term for buses that leave out of Chinatown in New York City). GLOVER said that during their visit, they all attended a gun show and that Lil Q and Munch gave GLOVER money to buy firearms for them.  (Despite GLOVER claiming Lil Q and Munch were the actual purchaser of those firearms, GLOVER admitted he filled out the ATF Form 4473 wherein he claimed he was the actual purchaser of those firearms.)

18.     I ran ROGERS' criminal history and found he had been convicted of the following felony offense:  *New York v. Frederick ROGERS*, Case No. 02844-2009, Criminal Possession of a Weapon – 2nd Degree, sentenced on December 8, 2010 to 5 years' imprisonment and 5 years' post release supervision.

7

19.     Based on this information, agents began investigating firearms violations by GLOVER and ROGERS, including a conspiracy to make false statements on ATF Form 4473 as to the actual purchaser of the firearm, transfer of firearms to an out-of-state resident, and transfer of firearms to a prohibited person.

*Information provided via Cash App, T-Mobile, Verizon, and AT&T*

20.     ATF investigators served subpoenas to Cash App, T-Mobile, Verizon, and AT&T to further investigate the case.  Based on their names, dates of birth, and known phone numbers, agents were able to identify a Cash App account that belonged GLOVER and two accounts that belonged ROGERS.  Transactions showed the transfer of money between GLOVER and ROGERS (using cash tag "SLOPE") on dates on or near GLOVER's purchases of firearms at FFL.  For example:

a.  *September 26, 2020*: GLOVER purchased one firearm from FFLs in the Northern District of Georgia (NDGA).  On September 26, 2020, ROGERS using Cash App paid GLOVER $700.

b.  *November 14, 2020*: GLOVER purchased 10 firearms from FFLs in the NDGA.  On November 14, 2020, ROGERS paid GLOVER $2,500 via Cash App.  Twenty minutes later, GLOVER paid ROGERS $2,500 via Cash App.

c.  *November 28 -29, 2020*: On November 28, 2020, GLOVER purchased eight guns from FFLs in the NDGA.  On November 29, 2020, GLOVER purchased five guns from FFLs in the NDGA.  On November 27, 2020, ROGERS paid GLOVER $272.00 via Cash App.  On November 28, 2020, ROGERS paid GLOVER $300 via Cash App.  Several hours later, ROGERS paid GLOVER $630 via Cash App.

8

d. *January 16, 2021*: On January 16, 2021, GLOVER purchased six guns from an FFL in the NDGA.  On January 16, 2021, ROGERS paid GLOVER $1,050 via Cash App.  About an hour later, ROGERS paid GLOVER $151 via Cash App.

e. *May 5, 2021*: On May 5, 2021, GLOVER purchased two guns from an FFL in the NDGA.  On May 5, 2021, ROGERS paid GLOVER $800 via Cash App.

f. *May 22, 2021*: On May 22, 2021, GLOVER purchased one gun from an FFL in the NDGA.  On May 22, 2021, ROGERS paid GLOVER $650 via Cash App.

*Cellsite and Call Detail Records*

21.     Agents learned of two telephone numbers associated with ROGERS.  Telephone number 917-605-4759 was listed as ROGERS's phone number on parole records.  Information subpoenaed from T-Mobile show ROGERS as the subscriber for the telephone number since January 20, 2021. Cash App lists this as the telephone number on one of ROGERS's Cash App accounts (the Slope account).   And, prior to the 4759 telephone, ROGERS was the subscriber to telephone number 917-250-4201 between September 25, 2019 through January 20, 2021.

22.     GLOVER's ATF Form 4473 listed phone number 470-557-2483 as his telephone number.  Subpoenaed records from AT&T and Verizon listed GLOVER as the subscriber of that telephone number.

23.     ATF investigators obtained call detail records for ROGERS' telephone (4201) (4759) and GLOVER'S telephone (2483) and cellsite information associated with two cellphone numbers associated with ROGERS on the day of and around the time of firearm purchases made by GLOVER at FFLs.  A review of call detail records show communications between GLOVER

and ROGERS around the date of some of the firearms purchases by GLOVER.  A review of

cellsite records showed ROGERS often traveled to Georgia the day before/the day of a purchase

and travelled back to New York (the EDNY and elsewhere) or New Jersey the same or following

day.

a.  *September 24 -26, 2020*: On September 24, 2020, GLOVER purchased two

firearms from FFLs in the NDGA.  On September 26, 2020, GLOVER

purchased one firearm from an FFL in the NDGA.  Cellsite data for

ROGERS's phone (4021) showed his phone in New Jersey on September 23,

2020.  The data then showed the phone traveling to Atlanta, Georgia (NDGA)

on September 24, 2020.  The data then showed the phone in Queens, New

York (EDNY) on September 27, 2020.  Call detail records show GLOVER

(2483) and ROGERS (4201) exchanged telephone calls on September 25, 26,

and 27, 2020.

b.  *November 28 -29, 2020*: On November 28, 2020, GLOVER purchased eight

guns from FFLs in the NDGA.  On November 29, 2020, GLOVER purchased

five guns from FFLs in the NDGA.  Cellsite data for ROGERS' phone (4201)

showed ROGERS in Manhattan, New York on November 25, 2020, then

traveling to Atlanta, Georgia (NDGA) on November 27, 2020, and then back

in Queens, New York (EDNY) on November 29, 2020.  Call detail records

show that GLOVER (2483) and ROGERS (4201) exchanged 8 telephone calls

between November 27 and 28, 2020.

c.  *January 16, 2021*: On January 16, 2021, GLOVER purchased six guns from

an FFL in the NDGA.  On January 13, 2021, cellsite data for ROGERS'

phone (4201) showed ROGERS in Queens, New York (EDNY). On January

15, 2021, the cellsite data showed ROGERS in Atlanta, Georgia (NDGA), and

then back in Queens, New York (EDNY) on January 17, 2021. Call detail

records show that GLOVER (2483) and ROGERS (4201) exchanged 8

telephone calls on January 16, 2021.

d. *May 22, 2021*: On May 22, 2021, GLOVER purchased one gun from an FFL

in the NDGA. On May 19, 2021, cellsite data for ROGERS' phone (4759)

showed him in Queens, New York (EDNY) on May 19, 2021, in Atlanta,

Georgia (NDGA) on May 22, 2021, and then back in Queens, New York

(EDNY) on May 23, 2021.

*Telephones associated with GLOVER and ROGERS*

24.     GLOVER's ATF Form 4473 listed phone number 470-557-2483 as his telephone

number. Subpoenaed records from AT&T and Verizon listed GLOVER as the subscriber of that

telephone number.

25.     Subpoenaed Cash App records showed phone number 470-513-4108 as an

additional phone number for GLOVER. Verizon records show that Donell GLOVER was the

subscriber for telephone number 470-513-4108 from June 12, 2021 through February 27, 2022

and is again currently the subscriber of that phone as of October 26, 2022.

26.     Both telephones are active as of October 23, 2023 and both list GLOVER's

address as 4598 Galleon XI, Decatur, GA 30035.

27.     T-Mobile records indicate that ROGERS is the subscriber for telephone number

917-605-4759 since January 20, 2021. Records further showed that the phone is currently

active and listed ROGERS' address as 18825 121st Ave, Saint Albans, New York 11412,

within the Eastern District of New York in Queens.

*The SUBJECT DEVICES*

28.     Based on the above information, I believe ROGERS is currently using a cellular telephone and that cellular telephone is located in the Eastern District of New York. Furthermore, based on the investigation above, I believe cellular telephones/electronic devices have been used in facilitating the criminal offenses described below, including to facilitate communication between the conspirators, to transfer money to facilitate the crime (including on applications like Cash App), to locate and communicate with FFLs, and to assist with travel/directions/locations.  Thus, there is probable cause to believe ROGERS will have possession of cellular telephones and/or other electronic devices (the SUBJECT DEVICES) at the time of his arrest.

29.     Based on my training and experience, and the investigation to date, I know that electronic devices store data for long periods of time, as further discussed below.  Thus, there is probable cause to believe that electronic devices, including cellular telephones, on the person of Frederick ROGERS, as well as any other electronic devices for which law enforcement has probable cause to believe belong to ROGERS given their location, including proximity to ROGERS at the time of the execution of this warrant (the SUBJECT DEVICES) will contain evidence of the SUBJECT OFFENSES.

30.     Furthermore, although ROGERS has not yet been charged with a crime, I understand that the United States Attorney's Office in the Northern District of Georgia intends to present an indictment before the Grand Jury on or about November 7, 2023.  Should the Grand Jury return an indictment and an arrest warrant issue, law enforcement officers currently intend to arrest ROGERS, and his co-conspirator, GLOVER, on or about November 8, 2023. Thus,

12

ROGERS is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).[2]

## Computers and Electronic Storage Devices

31.     Based on my training and experience, I use the following technical terms to convey the following meanings:

32.     *Wireless telephone*:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

33.     *Digital camera*:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by

---

[2]   Rule 41(c)(4) "covers a defendant or witness for whom an arrest warrant has theretofore issued, or a defendant for whom grounds to arrest exist even though no arrest warrant has theretofore issued."  Fed. R. Crim. P. 41, Advisory Committee Note (1979).

connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

34.     *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

35.     *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically

calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

36.     *PDA*:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

37.     *IP Address*: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

38.     *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

39.     Based on my training, experience, and research, I know that the SUBJECT DEVICES are likely to have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**Electronic Storage and Forensic Analysis**

40.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

41.     *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICES because:

42.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

43.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

44.     A person with appropriate familiarity with how an electronic device works may,

16

after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

45. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

46. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

**Nature of Examination and Request to Seal**

47. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

48. This warrant seeks permission to seize the SUBJECT DEVICES and then later forensically search devices once they are in law enforcement's possession. I hereby request the Court's permission to seize the items outlined in Attachment B that are believed to contain some or all of the evidence described in the warrant and Attachment B, and to conduct an off-site search of the computers and/or electronic hardware for the evidence described.

49.     Since the investigation is on-going and neither ROGERS nor GLOVER have yet been arrested, the disclosure of the search warrant and the contents of the affidavit at this time would seriously jeopardize the investigation, as such disclosure may provide an opportunity for persons involved to further destroy evidence or change patterns of behavior.  Thus, it is requested that this warrant and its application and attachments be placed under seal.

**Conclusion**

50.     Based on the foregoing information, I respectfully submit that there is probable cause to believe in the SUBJECT DEVICES is contraband, the fruits of crime, or things otherwise criminally possessed, and/or is property which is or has been used as the means of committing the foregoing SUBJECT OFFENSES.  I therefore respectfully request that the attached warrant be issued authorizing the search for and seizure of the items listed in Attachment A.

Respectfully submitted,

_/s/ Tatiana Biess_____
TATIANA BIESS
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Subscribed and sworn to before me via
telephone or reliable electronic means on
November___, 2023

Hon. Ramon E. Reyes, Jr.    Digitally signed by Hon. Ramon E. Reyes, Jr.
                            Date: 2023.11.08 10:05:23 -05'00'
_____
THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

**Attachment A**
**<u>Property to be Searched</u>**

The property to be searched is the SUBJECT DEVICES: electronic devices, including cellular telephones, on the person of Frederick ROGERS, as well as any other electronic devices for which law enforcement has probable cause to believe belong to ROGERS given their location, including proximity to ROGERS at the time of the execution of this warrant and/or based upon information provided by ROGERS at the time of his arrest on or after November 8, 2023. This warrant authorizes the forensic examination of the SUBJECT DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

**Attachment B**
**Particular Things to Be Searched and Seized**

1.      All records on any electronic devices, including cellular phones, tablets, and/or computers, found on the person of Frederick ROGERS, as well as any other electronic devices for which law enforcement has probable cause to believe belong to ROGERS given their location, including proximity to ROGERS at the time of the execution of this warrant (the SUBJECT DEVICES) that relate to violations of firearms laws, including knowingly making false written statements to licensed dealers of firearms, sale and transfer of firearms to a non-resident, and sale or disposal of a firearm to a prohibited person, in violation of Title 18, United States Code, Sections 922(a)(6), 922(a)(5), 922(d)(1), and 371 (the SUBJECT OFFENSES) since **September 1, 2020 to present,** including:

   a.   lists of persons and/or entities from whom Frederick ROGERS has purchased firearms;

   b.   lists of persons and/or entiles to whom Frederick ROGERS has sold firearms;

   c.   types, amounts, and prices of firearms purchased and/or transferred, as well as dates, places, and amounts of specific transactions;

   d.   any communication between Donell GLOVER, Frederick ROGERS, "Lil Q," and/or "Munch," including logs of voice calls, voicemails, text/SMS messaging, emails, and/or photographs exchanged on any application;

   e.   any information or communication regarding Donell GLOVER's and/or Frederick ROGERS's schedule or travel to or from the Northern District of Georgia, including calendar entries, reservations, and/or bookings;

21

    f.   all records of financial transactions between Donell GLOVER and Frederick ROGERS, including those made on Cash App or any other application/program that facilitates the transfer of money;

    g.   any information or communication between Donell GLOVER and Frederick ROGERS regarding the transfer/payment/exchange of money for firearms;

    h.   any financial information regarding Donell GLOVER's and/or Frederick ROGERS's schedule or travel to or from the Northern District of Georgia.

2.    Evidence of user attribution showing who used or owned the SUBJECT DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.    Records evidencing the use of the Internet including:

    a.   records of Internet Protocol addresses used;

    b.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, ATF may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.